83 So.2d 607

**Francis Louis BERNESS**

**v.**

**STATE.**

**8 Div. 126.**

Court of Appeals of Alabama.

Sept. 8, 1953.

Rehearing Denied Oct. 20, 1953.

T. Eugene Burts, Jr., Florence, for appellant.

Si Garrett, Atty. Gen., and L. E. Barton, Asst. Atty. Gen., for the State.

HARWOOD, Judge.

This appellant was indicted for, and found guilty of murder in the second degree.

The State's evidence tended to show that the appellant and Claud W. Wright were together in Florence on the morning of December 19, 1951.

The two rode around in appellant's automobile and during the morning drank beer and whiskey. At the last place they stopped Wright took over the driving of the automobile, and they started for the home of appellant's father-in-law to deliver a pint of whiskey.

As they were travelling down a main highway, at a "pretty fast" speed, the automobile struck and killed Miss Ella Wee Tays, 25 years old and crippled. At the time Miss Tays and a niece were walking about 4 feet off the paved portion of the highway, in the same direction as the automobile was moving, but on the opposite side of the highway. It was therefore necessary for the car to cross the entire highway and go out onto the shoulder in order to strike the girl.

Miss Tays was knocked some 22 steps through the air by the impact and death was instantaneous.

Wright stopped the car some 75 yards down the road and he and appellant returned to the scene. They stood around 10 or 12 minutes and left. According to appellant's statement, which was read in evidence by the State, someone in the crowd at the scene told them they could go.

After Wright and appellant had driven off they were followed and overtaken by some of the bystanders. They were told that they had killed a girl and should return. They agreed to do so, but at a crossroads took a road which did not lead back to the place of the accident. The appellant, in his statement above mentioned, attributed this to lack of familiarity with the area.

In the meantime the highway patrol had been notified and a patrolman found the men parked in front of a rural store and placed them under arrest.

The appellant offered no evidence in the trial below.

However, by a motion to exclude the State's evidence, timely made and appropriately grounded, and also by a request for the affirmative charge as to murder in the second degree, the appellant questioned the sufficiency of the evidence to sustain a conviction of murder in the second degree, in that the evidence showed that Wright, and not the appellant, was driving the automobile at the time it struck Miss Tays.

■ It is well settled under our decisions that where the accused is himself the driver of an automobile and drives it in a manner greatly dangerous to the lives of others so as to evidence a depraved mind regardless of human life, he may be guilty of murder in the second degree if his anti-social acts result in death of another, and this though he had no preconceived purpose to deprive any particular human being of life. Under such circumstances his acts are unlawful and without legal excuse, and malice may be inferred therefrom. Reed v. State, 25 Ala.App. 18, 142 So. 441; Williams v. State, 30 Ala.App. 437, 7 So.2d 511; Hyde v. State, 230 Ala. 243, 160 So. 237.

We have no cases in this State dealing with the factual situation presented by the present record, i. e. where the owner of an automobile permits a person he knows, or should know, is drunk, to drive it, and thereafter sits by his side while the second person drives it in such a manner as to cause death to another.

This factual situation has been presented to other courts, and in well-reasoned opinions these courts have concluded that under such circumstances the car owner may well be guilty of murder.

In Brewer v. State, 140 Tex.Cr.R. 9, 143 S.W.2d 599, the facts showed that the automobile causing the death of a third person belonged to the appellant. It was driven by appellant's companion, with whom appellant had been drinking. Appellant sat by his companion's side.

In affirming the conviction of murder the Texas Court wrote:

"We have held that an automobile is not a dangerous weapon per se, but when placed under the control of 'alcohol at the wheel and gasoline in the tank' and driven upon the highway, the results are so uncertain that the owner agreeing thereto may be held reasonable for the resulting death as though he himself had, with his own hands guided the wheel." Brewer v. State, 140 Tex.Cr.R. 9, 143 S.W.2d 599, 601.

The court further observed that the acts of the appellant Brewer under the circumstances "evidenced a heart regardless of social duty and fatally bent on mischief, meeting the legal definitions of that elusive term—malice." To like effect is the doctrine of Banks v. State, 85 Tex.Cr.R. 165, 211 S.W.2d 217, 5 A.L.R. 600.

The Supreme Court of North Carolina, in State v. Trott, 190 N.C. 674, 675, 130 S.E. 627, 630, 42 A.L.R. 1114, sustained a conviction of murder where the facts showed that the appellant, while intoxi-

**4**

cated, had directed his drunk companion to drive appellant's automobile. The car while so driven collided with another automobile, killing a passenger in the second vehicle.

The court pointed out that malice does not necessarily mean an actual intent to take human life, but may be inferential or implied when an act is done in such a manner as to indicate a depravity of mind and disregard of human life. The court further observed:

> "Over the car (i. e., the owner) had absolute control; he had procured or assisted in procuring the whisky; and he was responsible at least in part for Michael's (i. e., the driver's) condition. After making Michael his chauffeur, and ordering him 'to get away' from the garage, he cannot now disclaim responsibility for the operation of the car under circumstances from which may be implied the malice that distinguishes murder in the second degree from the lesser crime of manslaughter."

Although the offense charged in Story v. U. S., 57 App.D.C. 3, 16 F.2d 342, 344, 53 A.L.R. 246, was involuntary manslaughter, the court in the course of its opinion observed:

> "If the owner of a dangerous instrumentality like an automobile knowingly puts that instrumentality in the immediate control of a careless and reckless driver, *sits by his side*, and permits him *without protest* so recklessly and negligently to operate the car as to cause the death of another, *he is as much responsible as the man at the wheel.*" (Emphasis supplied.)

■ It is our conclusion therefore that the court properly denied appellant's motion to exclude the State's evidence, and his request for charges, affirmative in nature, as to murder in the second degree for the reasons above set forth.

An incident occurred however during the course of this trial which, in our opinion, necessitates a reversal of this cause, which incident was fully brought to the court's attention by a motion for a new trial and hearing thereon.

After the hearing and arguments had been completed, but before the court had instructed the jury, the court declared a noon recess. The jury were permitted to separate, but cautioned by the court not to discuss the case either among themselves or with anyone else.

As appellant's attorney was returning to the court house after lunch, accompanied by another attorney, they observed on a corner near the court house several of the jurors in conversation with one of the State's main witnesses. There was also in the group Mr. Luther Tays, a distant relative of the deceased girl.

As the two attorneys passed the group one of them remarked "There goes Berness' lawyer." The two attorneys passed on down the street, and after discussing for a few minutes what they had seen, they proceeded to the chambers of the trial judge. Judge Hill was then in the Register's Office, which adjoins his private office, reading decisions in preparation for his oral charge. As to what occurred from this point we quote the following excerpt from Judge Hill's statement read into the record on the hearing on the motion for a new trial:

> "At approximately 12:45 p. m. someone knocked on the door and I opened it and found that Mr. Eugene Burts, Attorney for the defendant, Berness, together with a friend of his, a lawyer, Mr. Emmett Roden, wanted to see me. They stated that they had seen one of the State's witnesses, to-wit: Mr. Grady P. Yancey, talking to one or more jurors on the southeast corner of the intersection of Court and Tennessee Streets, which point was visible from the office in which I was working and in which the three of us were then standing. They directed my attention through the window to the group, and I saw some men standing and talking, though I could not make out who it was. I then

stated to Mr. Burts that I was very sorry this circumstance had arisen, that I had instructed and reinstructed the jury not to talk to anyone about the case, etc., but that I would go down there immediately and see what they were talking about and tell them that they should not talk to any witness in the case about any subject—or words to that effect. I do not remember whether the Attorney for the defendant made any reply to this suggestion on my part, or any statement whatsoever concerning it.

"I went to the corner in question and saw two or three jurors, whose names I do not remember, but Mr. Grady P. Yancey was not there at that time. I then told these jurors that it had been reported to me that a witness for the State had been talking to them on that corner a few moments before. I told them, in substance, that we had to be very, very careful about the actions of jurors during recesses in cases in court, and that they should not engage in conversation with any person who had been a witness in a case, or who had anything to do with the case, or who might have any interest in the case one way or the other, and that they should not let any such person converse with them. I further stated that it would be better for them not to talk to anybody in the case, or any such person who might have any interest in the case about any subject, not about the weather or any such innocent subject. These three men assured me at that time that no one had talked to them about anything concerning the case at trial.

"I then left that corner, crossed the Street, went into the second store from the corner, which was Milner's Drug Store, and there found Mr. Grady P. Yancey. I told Mr. Yancey that it had been reported to me that he had been seen talking to one or more of the jurors. Mr. Yancey quickly told me that he had not meant any harm and was sorry that he had talked to any of the men at all on the street corner, but that he had merely told one man that some man named Williams, who had been absent from this County approximately fifty years was back in the County and wanted to see some kinsman of one of the jurors, or words to that effect. I told Mr. Yancey that it would be better for him not to talk to any juror about any subject—the weather or otherwise. I then ate my lunch in Milner's Drug Store and returned later to the Courtroom."

Undoubtedly the spontaneous actions of the very able trial judge were motivated by his earnest desire to see that this case was conducted according to all the rules of trial procedure, the observance of which he had studiously enforced so long as the participants were under his direct and orderly control. Regardless it would seem that the net result of his actions upon being informed that the jurors had disobeyed his injunctions created a situation aptly described by Robert Burns when he observed that:

"The best laid schemes o' mice an' men
Gang aft a-gley,
An' lea'e us nought but grief an' pain."

In two recent cases, one by the Supreme Court, and one by this court, See Neal v. State, 257 Ala. 496, 59 So.2d 797; Chaney v. State, 36 Ala.App. 374, 56 So.2d 385, it was held to be reversible error for the judge, even though accompanied by defense counsel, solicitor, and court reporter, to go into the jury room and further instruct the jury in the absence of the defendant.

■ This for the reason that it has been a long recognized tenet of the common law, based both upon the interest of the accused as well as the interest of the public, that the continuous presence of the accused from arraignment to sentence is an essential part of the process of trial and without which the courts have no jurisdiction to pronounce judgment upon him. Conformity to this rule is jurisdictional.

In the discharge of his official duties the judge's place is upon the bench. Even there, he can have no communication with the jury except in open court, and, in felonies, in the presence of the accused and his counsel if reasonably available.

In the present case the communication between the judge and jurors was in the street, and in the absence of both counsel and accused. Fundamental constitutional rights of the accused were thus infringed, negating the court's jurisdiction to render judgment. Under such circumstances there can properly be no application of the doctrine of error without injury.

The court therefore erred in denying appellant's motion for a new trial on the grounds above discussed.

Other points are argued in appellant's briefs. These are not likely to arise in another trial of this case and we pretermit consideration of them.

Reversed and remanded.

CARR, Presiding Judge (dissenting).

In the opinion prepared for this court by Judge HARWOOD the following appears:

"* * * the continuous presence of the accused from arraignment to sentence is an essential part of the process of trial and without which the courts have no jurisdiction to pronounce judgment upon him. Conformity to this rule is jurisdictional. * * * Under such circumstances there can properly be no application of the doctrine of error without injury."

The effect of the holding, as I interpret the statement, is that in all criminal prosecutions when it is established that the defendant was not continuously present at every stage of the proceedings from arraignment to sentence, this is the end of the matter. No inquiry is permitted to determine whether or not the substantial rights of the accused were in any manner jeopardized by what was said or done at the time of his absence.

I do not find myself in accord with this conclusion.

In fairly recent cases from our Supreme Court, it was held that, in non-capital cases, the personal presence in court when the verdict is returned by the jury may be waived by the defendant. Lee v. State, 244 Ala. 401, 13 So.2d 590; Cobb v. State, 250 Ala. 496, 35 So.2d 86.

Judge HARWOOD authored the opinion for this court in Huffman v. State, 35 Ala. App. 607, 51 So.2d 266, 268. He observed: "No consent of the defendant to the irregular reception of the verdict in his absence is present in this case. In fact it affirmatively appears that he did not consent."

Huffman was indicted for murder in the first degree.

It has been held that, when a part of the trial proceedings was conducted in the absence of the accused, it was not harmful error and a basis for reversal if the defendant was brought into court and the same proceedings were repeated in his presence. Gable v. State, 31 Ala.App. 280, 15 So.2d 594, certiorari denied 245 Ala. 53; 15 So.2d 600; Ferguson v. State, 24 Ala.App. 491, 137 So. 315, certiorari denied 223 Ala. 521, 137 So. 317; Kelley v. State, 32 Ala.App. 408, 26 So.2d 633.

If we adhere to Judge HARWOOD'S view the case of Cooper v. State, 31 Ala. App. 356, 18 So.2d 420, certiorari denied 245 Ala. 639, 18 So.2d 423, must be overruled.

In the absence of the defendant the trial judge went into the jury room and gave specific instructions with reference to the manner of fixing punishment. We applied Supreme Court Rule 45 and held that under the circumstances no injury inured to the accused. On certiorari the Supreme Court denied the writ without an opinion.

Judge HARWOOD anchors his views on the holdings in Neal v. State, 257 Ala.

496, 59 So.2d 797, and Chaney v. State, 36 Ala.App. 374, 56 So.2d 385. Both of these prosecutions involved capital crimes.

In the Neal case Justice Stakely states: "It is settled that the continuous presence of the defendant from arraignment to sentence is an essential part of the process provided for the trial of the defendant and without which the court has no jurisdiction to pronounce judgment against him." [257 Ala. 495, 59 So.2d 798.]

It may be noted that the statement does not exclude non-capital cases.

Clearly there are reason and logic in Judge HARWOOD'S view when based on this general statement of Justice Stakely.

The authority must be taken and construed in the light of its factual foundation.

I do not feel that we are compelled to follow the general statement in the Neal case, since we are here concerned with a non-capital case.

It is interesting to note that Justice Stakely reviewed the Cooper case, supra, when it was before the Supreme Court on certiorari.

Judge HARWOOD quotes from Robert Burns.

Lord Coke said: "Reason is the life of the law; nay the common law itself is nothing but reason."

I do not recall who said this: "What is just and right is the law of laws."

"Cessante ratione legis, cessat et ipsa lex."

Judge HARWOOD set out in full the trial judge's statement.

I will not attempt to analyze the effect of the circumstances as they relate to the substantial rights of the accused. I am clear to the conclusion that there is nothing in the judge's statement to the "two or three jurors" which could have in any manner been prejudicial to the defendant's rights to a fair, impartial trial.

There are two other questions worthy. of note. However, I will rest my dissent on what I have written hereinabove.

The appellant's attorney knew, before the conclusion of the trial, that the judge conversed .with the jurors at the noon recess. He made no objections during the progress of the trial, but rather speculated on the verdict and waited to raise the complaint on the motion for a new trial.

I entertain serious doubt as to the essentiality of the judge's statement to the jurors as it relates to the rule of the continuous presence of the accused.

In Lee v. State, 31 Ala.App. 91, 13 So.2d 583, 589, Justice Simpson, when a member of this court, had this to say: "It is a part of our canonical structure * * * that a defendant must be personally present at every *important* step in his trial * * *." (Emphasis supplied.)

I respectfully dissent.